## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

CHERYL RADIX, JULIAN CARRINGTON, AUDRA HEAVEN, JIGAR PATEL, and ACHEBE SAM, *on behalf of themselves and all others similarly situated*,

Case No. 1:22-cv-6632

*Plaintiffs*,

*vs.*

KENSINGTON INTERNATIONAL, INC., JOHN GELIN, EYAN EDWARDS, RHINA HERNANDEZ, RICARDO BLACK, KENNSINGTON CAPITAL GROUP, LLC, THE BUSINESS BUYERS CLUB, LLC, ARTIST SOLUTIONS, LLC D/B/A ARTIST FINANCIAL PROGRAMS or UNKNY, ULTIMATE BETTER WORLD SOLUTIONS LLC, FINANCIAL SAVER NETWORK, INC. D/B/A E-FUNDING COMPANY,  KAY VANG-THAO, BURKE MCFARLAND A/K/A NOEL MCFARLAND, and SOUTHERN LAND PARTNERS, LLC,

*Defendants*.

## CLASS ACTION COMPLAINT

## **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................................................1

II.  JURISDICTION AND VENUE............................................................................................5

III. PARTIES................................................................................................................................6

    A. Plaintiffs........................................................................................................................6

    B. Defendants ....................................................................................................................6

IV.  GENERAL FACTUAL ALLEGATIONS............................................................................8

    A. The Kensington Enterprise's Fraudulent Inducement of Plaintiffs' Investments Through Seven Material Misrepresentations, Made in Phone Calls, Promotional Materials and Via KI, Inc.'s Website. ..........................................................................8

        1. The Inducement Calls.............................................................................................9

        2. The Brochures........................................................................................................9

        3. The Websites. .......................................................................................................10

    B. Seven Material Misrepresentations Inducing Plaintiffs' Investment...................10

        1. Capitalization Misrepresentation.........................................................................11

        2. Establishment Misrepresentation.........................................................................12

        3. Institutional Experience Misrepresentation .........................................................13

        4. Past Success / Testimonial Misrepresentation......................................................13

        5. Guarantee Misrepresentation...............................................................................14

        6. Section 8 Misrepresentation.................................................................................15

        7. General Intent-to-Perform Misrepresentation .....................................................16

    C. Plaintiffs Relied on the Kensington Enterprise's Fraudulent Misrepresentations in Deciding to Invest in KI, Inc. .................................................................................16

    D. Plaintiffs Enter "Joint Venture" Agreements ("JVAs") with KI, Inc. ...................17

    E. KI, Inc. Breaches the JVAs and Fails to Make Payments Due..............................19

    F. Kensington's Fraudulent Concealment After Plaintiffs' Investments...................20

        1. Specific Property Misrepresentation/Concealment ..............................................20

        2. HGTV Misrepresentation/Concealment ...............................................................21

        3. "Southern Land Partners" Misrepresentation/Concealment................................22

        4. Debt Service Payments Misrepresentation/Concealment......................................22

    G. Plaintiffs Discover That the Kensington Enterprise Is a Fraud, Operated by an Individual (Gelin) Who Had Previously Been Convicted of Felony Wire Fraud..................................24

V.    INVOLVEMENT OF EACH DEFENDANT...........................................................25

VI.   PLAINTIFFS' RESPECTIVE DAMAGES RESULTING FROM THEIR INVESTMENTS
IN KENSINGTON. ........................................................................................................27

VII.  CLASS ALLEGATIONS...........................................................................................28

VIII. ALTER EGO ALLEGATIONS ...............................................................................31

IX.   CAUSES OF ACTION...............................................................................................32

X.    PRAYER FOR RELIEF .............................................................................................39

XI.   JURY DEMAND ........................................................................................................40

## I.      INTRODUCTION

1.      Plaintiffs bring this putative class action against Defendants Kensington International, Inc., John Gelin, Eyan Edwards, Rhina Hernandez, Ricardo Black, Kennsington Capital Group, LLC, The Business Buyers Club, LLC, Artist Solutions, LLC (d/b/a Artist Financial Programs and UNKNY), Ultimate Better World Solutions LLC, Financial Saver Network, Inc. (d/b/a E-Funding Company), Kay Vang-Thao, Burke McFarland (a/k/a Noel McFarland), and Southern Land Partners, LLC (all collectively, "Defendants") for violations of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 et. seq. (hereinafter "RICO"), as well as state law claims for fraudulent inducement, breach of contract, breach of fiduciary duty, fraudulent concealment, and equitable accounting.   Defendants collective enterprise constitutes an "association-in-fact" pursuant to 18 U.S.C. §1961(4), hereinafter referred to as the "Kensington Enterprise."

2.      Through a pattern of multifaceted racketeering activities detailed herein, Defendants systematically recruited dozens and perhaps hundreds of individuals—including the five named Plaintiffs in this action—to furnish moneys for what was designed to appear as a legitimate real estate investment opportunity but ultimately proved to be a fraudulent real estate investment scam.

3.      Defendants presented Kensington International, Inc. ("KI, Inc.") as an established real estate investment firm with a proven model, when in fact it was little more than a shell company operated by a felon convicted of mortgage fraud.   Through a combination of slick presentations and aggressive salesmanship—both fraught with numerous material misrepresentations—Defendants fraudulently induced Plaintiffs and the putative class to enter contractual arrangements couched as "Joint Venture Agreements" (hereinafter, "JVAs") with KI,

1

Inc.  As an example, a copy of the "Joint Venture Agreement" provided to Radix is attached to this Complaint as Exhibit 1.

4.      **The named Plaintiffs alone collectively paid more than $900,000.00, all of which is now due and owing under the dubious contracts provided by Defendants.  Upon information and belief, dozens of other individuals in the putative class were similarly defrauded.**

5.      The Kensington Enterprise's investment proposition to Plaintiffs and the putative class was as follows: investors would take out personal loans from legitimate lending institutions, then provide those funds to KI, Inc. in the form of a loan.  KI, Inc. would then use the funds and its own outside financing to acquire residential properties, specifically in New Jersey.  KI, Inc. would finance and manage the rehabilitation and resale of the acquired properties.  Any profits on the resold properties would be distributed amongst KI, Inc. and Plaintiffs.  KI, Inc. would make debt service payments on the loans and then fully repay each loan within one year.

6.      Plaintiffs have subsequently discovered that this so-called opportunity was a complete fraud.  Specifically, the purported investment opportunity premised on seven key material misrepresentations, which were made through a series of solicitation calls, in marketing brochures, and in websites:

    **(i)    Capitalization Misrepresentation:** The Kensington Enterprise materially misrepresented that KI, Inc. was adequately capitalized and had enough cash on hand to repay its loans from investors.  This was false and misleading; upon information and belief, KI, Inc. never had any significant capital reserves or the ability to repay Plaintiffs' funds.

2

**(ii)   Establishment Misrepresentation**: The Kensington Enterprise materially misrepresented KI, Inc. to be a professional, established, and financially sound real estate investment firm.   This was again false and misleading; the Kensington Enterprise had only formed KI, Inc., in November 2017, and it was little more than a shell corporation.

**(iii)   Institutional Experience Misrepresentation**: The Kensington Enterprise materially misrepresented the nature of KI, Inc.'s management and workforce, stating that its team was "comprised of contractors, real estate agents, brokers, seasoned investors" whose "combined experience" gave it an "intimate and detailed knowledge of market trends in the Greater New York area."  This too was false and misleading; KI, Inc. was in fact an enterprise comprised of real estate and investment industry novices led by a convicted fraudster.

**(iv)   Past Success / Testimonial Misrepresentation:** The Kensington Enterprise materially misrepresented the proposed commercial transactions by citing to a variety of testimonials which suggested that KI, Inc. had successfully served many other investors in the past.  In fact, the testimonials were misleading, and on information and belief, some were entirely fabricated.

**(v)   Guarantee Misrepresentation**:  The Kensington Enterprise misrepresented and/or omitted material facts regarding personal guarantees that KI, Inc.'s officers used to induce Plaintiffs into providing funds.  In reality, none of the guarantors had the assets, credit, or intention to guarantee Plaintiffs' loans, and especially given that one of them was a convicted felon.

**(vi) Section 8 Misrepresentation**: The Kensington Enterprise misrepresented its purported special connections with contractors who were "Section 8 housing approved" and that this approval would allow it to obtain property from the government (or as part of government programs) at favorable prices. This was again false and misleading.

**(vii) General Intent-to-Perform Misrepresentation**: The totality of the circumstances detailed herein permit the reasonable inference that the Kensington Enterprise persuaded Plaintiffs to furnish monies with a slew of promises that the Kensington Enterprise generally did not intend to perform on. Thus, the Kensington Enterprises promises to perform were material as well as false and misleading.

7. After the Kensington Enterprise fraudulently induced Plaintiffs to borrow significant amounts of money to invest with KI, Inc., the extent of the fraud slowly became clear as KI, Inc. proceeded to systematically deviate from its investment proposition and violate the core terms of its contracts with Plaintiffs and the putative class.

8. KI, Inc. ultimately defaulted on all the loans it owed to the five named Plaintiffs.

9. Further, Plaintiffs had been assured (and contractually promised) that KI, Inc. would at least provide minimum payments on the debt which Plaintiffs had been led to take out in their own names.

10. By 2019, however, KI, Inc. had abruptly stopped making these payments without even notifying Plaintiffs.

11. By 2020, KI, Inc. and its principals seemed to dissolve into thin air; its various websites and social media pages were abandoned, and its agents stopped responding to Plaintiffs' inquiries.

12.     None of the five Plaintiffs ever received any repayment for their so-called 'investments'.

13.     This placed Plaintiffs in the difficult position of either paying off the loans themselves or experiencing a severe impairment of their credit.

14.     The Kensington Enterprise also induced Plaintiffs not to seek enforcement of their respective contracts through a variety of fraudulent concealments. These false excuses, assurances, and obfuscations fraudulently concealed Kensington's lack of funds to meet its financial obligations to Plaintiffs.

15.     The various individuals comprising the Kensington Enterprise have acted in concert through the years to conceal the unlawful conduct set forth herein by a variety of tactics to prevent Plaintiffs from discovering their illegal conduct through reasonable diligence.

16.     As a result of Defendants' unlawful and fraudulent conduct, Plaintiffs have collectively suffered millions of dollars in economic damages.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to CAFA and 28 U.S.C. § 1332(D)(2) because the matter in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, and is a class action in which members of a class of plaintiffs are citizens of a State different from that of defendants.

18.     Separately, this Court also has subject-matter jurisdiction pursuant to Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1964(c), as well as pendent and/or supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is proper because many of the acts and transactions giving rise to the violations of law alleged in this Complaint occurred in this District and many of the Defendants reside in this District.

20.     Defendants KI, Inc., Gelin, and Edwards have also contractually consented to the personal jurisdiction of this Court and waived any objections to jurisdiction or venue in New York.

III.    **PARTIES**

A.      **Plaintiffs**

21.     Plaintiff Cheryl Radix ("Radix") is a data privacy consultant residing in Virginia. Pursuant to a Joint Venture Agreement with KI, Inc. executed in October 2018, Radix furnished $172,370 to the Kensington Enterprise.

22.     Plaintiff Julian Carrington ("Carrington") is a software engineer residing in New York. Pursuant to a Joint Venture Agreement with KI, Inc. executed in April 2018, Carrington furnished $175,000 to the Kensington Enterprise.

23.     Plaintiff Audra Heaven ("Heaven") is a bank teller residing in New York. Pursuant to a Joint Venture Agreement with KI, Inc. executed in October 2018, Heaven furnished $109,700.0 to the Kensington Enterprise.

24.     Plaintiff Jigar Patel ("Patel") is a User Experience Designer residing in New Jersey. Pursuant to a Joint Venture Agreement with KI, Inc. executed in April 2018, Patel furnished $265,000 to the Kensington Enterprise.

25.     Plaintiff Achebe Sam ("Sam") is a data security specialist residing in New York. Pursuant to a Joint Venture Agreement with KI, Inc. executed in February 2019, Sam furnished $185,000.00 to the Kensington Enterprise.

B.      **Defendants**

26.     Defendant John Gelin ("Gelin") resides in Brooklyn, New York. At the time of Plaintiffs' investments, Gelin held himself out as CEO of Defendants KI, Inc. and Kennsington Capital Group, LLC ("KCG"), and The Business Buyers Club, LLC, ("BBC").

6

27.     Defendant Eyan Edwards's ("Edwards") last recorded residence was in New Jersey. At the time of Plaintiffs' investments, Edwards held himself out as Vice President of Client Development of Defendants KI, Inc. and KCG.

28.     Defendant Rhina Hernandez ("Hernandez"), who, based on information and belief is Gelin's spouse, resides in Brooklyn, New York.

29.     Defendant Ricardo Black ("Black") is an individual residing in New York. At the time of Plaintiffs' investments, Black held himself out as Director of Regional Operations of Defendants KI, Inc. and KCG, and "Founder/Chief Solutions Officer" of Defendant Ultimate Better World Solutions, LLC ("UBWS").

30.     Defendant Burke McFarland ("McFarland"), also known as Noel McFarland, is an individual residing in Tennessee.

31.     Defendant Kaolee Vang-Thao ("Vang-Thao") is an individual residing in the state of Minnesota.

32.     Defendant Kensington International, Inc. ("KI, Inc."), is an active domestic business corporation incorporated in New York State in November 2017.

33.     Defendant Kennsington Capital Group, LLC ("KCG"), is an active domestic limited liability company organized in New York State in February 1999.

34.     Defendant The Business Buyers Club, LLC, ("BBC") is an active domestic limited liability company incorporated in New York State in June 2015.

35.     Defendant Ultimate Better World Solutions, LLC ("UBWS") is an active domestic limited liability company organized in New York State in January 2014.

36.     Defendant Artist Solutions, LLC (d/b/a Artist Financial Programs) ("Artists Financial") is an active domestic limited liability company incorporated in New York State.

37.     Defendant Southern Land Partners LLC ("SLP") is an active domestic limited liability company incorporated in Tennessee.

38.     Defendant Financial Saver Network, Inc. (d/b/a E-Funding Company) ("FSN") is an active business corporation incorporated in Minnesota in July 2011.

39.     Defendants Gelin, Edwards, Hernandez, Black, Vang-Thao, and McFarland are more specifically referred to herein as the "Individual Defendants."

40.     Defendants KI, Inc., KCG, BBC, UBWS, Artists Solutions, FSN and SLP are more specifically referred to herein as the "Corporate Defendants."

41.     All Defendants are collectively referred to herein as the "Kensington Enterprise."

IV.    **GENERAL FACTUAL ALLEGATIONS**

A.    **The Kensington Enterprise's Fraudulent Inducement of Plaintiffs' Investments Through Seven Material Misrepresentations, Made in Phone Calls, Promotional Materials and Via KI, Inc.'s Website.**

42.     The Kensington Enterprise made numerous fraudulent representations that were intended to, and did, induce Plaintiffs to enter contracts with KI, Inc. and furnish money to the Kensington Enterprise.

43.     These fraudulent representations were made via: (a) phone calls, (b) marketing brochures, sent electronically, and (c) KI, Inc.'s website, all further detailed below.

44.     The Kensington Enterprise systematically and continuously disseminated these false and misleading statements via interstate wire communications (i.e., the internet and telephone) for at least two years.

45.     The Kensington Enterprise made these misrepresentations either with knowledge of their falsity or with reckless disregard for the truth.

46.     Plaintiffs reasonably relied on these misrepresentations, which were material to Plaintiffs' decisions to invest in Defendant KI, Inc.

### 1.    The Inducement Calls

47.    At various dates in 2017 and 2018, all Plaintiffs had telephone calls with Kensington Enterprise representatives (hereinafter collectively referred to as the "Inducement Calls"), after being introduced to such representatives through friends or relatives.

48.    In most cases, the Kensington Enterprise representative in question was either Edwards, who held himself out as KI, Inc.'s Vice President of Client Development, or Black, who held himself out as Director of Regional Operations.

49.    The purpose of the Inducement Calls was generally to convince the Plaintiffs to borrow money from legitimate lenders and invest and/or loan that money to KI, Inc., which the Kensington Enterprise claimed it would then invest in real estate properties.   Specific examples include:

(i)    **Radix** received an Inducement Call from Ricardo Black in early September 2018.

(ii)    **Carrington** received an Inducement Call from Eyan Edwards and Ricardo Black in early February 2018.

(iii)    **Heaven** received an Inducement Call from Ricardo Black in September or October of 2018.

(iv)    **Patel** received an Inducement Call from Eyan Edwards in February 2018.

(v)    **Sam** received an Inducement Call from Ricardo Black in September 2018.

### 2.    The Brochures

50.    After these introductory Inducement Calls, the Kensington Enterprise's representative would follow up by sending a marketing brochure (hereinafter collectively referred to as the "Brochures"), typically via email.

51.    The Brochures provided to Plaintiffs include the same substantive claims, although many such claims appear to have been amplified from 2017 to 2018.   As an example, a copy of

the brochure provided to Radix is attached to this Complaint as <u>Exhibit 2</u>. It was sent to Radix by email from Black on September 13, 2018 at 11:15 PM.

       **3.     The Websites.**

52.     All of the Plaintiffs also report going online to check out KI, Inc.  They all report visiting either <u>http://www.kennsington.co</u> or <u>http://www.kensingtoninternational.com</u>, which are both linked to in various Brochures (hereinafter collectively referred to as the "Websites").

53.     The Websites reiterated many if not all of the same misrepresentations made in the Inducement Calls and the Brochures.

54.     A copy of <u>http://www.kennsington.co</u> as it appeared on August 11, 2020 is attached to this Complaint as <u>Exhibit 3</u>.

55.     A copy of <u>http://www.kensingtoninternational.com/testimonials/</u> as it appeared on June 10, 2019 is attached to this Complaint as <u>Exhibit 4</u>.

56.     The Kensington Enterprise also made extensive use of social media platforms, particularly its Facebook page.

57.     A copy of KI, Inc.'s YouTube page as it appeared on November 28, 2019 is attached to this Complaint as <u>Exhibit 5</u>.

58.     A copy of KCG's Facebook page as it appeared on October 26, 2022 is attached to this Complaint as <u>Exhibit 6</u>.

     **B.     <u>Seven Material Misrepresentations Inducing Plaintiffs' Investment</u>**

59.     In all five of the Plaintiffs' cases, and those of the putative class, the Inducement Calls, Brochures, and Websites included seven key material misrepresentations, detailed in the following sections:

### 1.    Capitalization Misrepresentation

60.     By and through the Inducement Calls and the Brochures, the Kensington Enterprise misrepresented the nature of its investment proposition to Plaintiffs by representing that KI, Inc. was a well-capitalized institution.

61.     Specifically, to make Plaintiffs comfortable about the risks of taking out loans to invest in KI, Inc., the company contractually promised to make debt service payments on Plaintiffs' loans, fully repay their investments within one year, reimburse them for any costs they incurred in connection with their loans, and even fully indemnify them from any loss in relation to the transaction.

62.     Thus, the Kensington Enterprise portrayed the investment as a risk-free yet lucrative opportunity which would result either in a profit from the resale of property, or simple repayment of the loan with an acceptable rate of interest.

63.     For example, the Brochures stated that KI, Inc. could: "*consistently ensure maximum risk mitigation & profitability, as well as a quick return on the investment.*"  *See* Ex. 2, at 1 (emphasis added).

64.     As a further false assurance to downplay the true risk of investing, the Kensington Enterprise represented during the Inducement Calls that it had adequate "backup funds."

65.     But the specific falsity in these representations was that KI, Inc. was adequately capitalized and had enough cash on hand to repay its loans from investors.

66.     These representations regarding KI, Inc.'s capitalization and its ability to repay Plaintiffs were materially false or misleading when made.  The statements and omissions concerned the state of KI, Inc. at the time Plaintiffs were induced to furnish monies to KI, Inc.

67.     These misrepresentations suggested that KI, Inc. had the financial stability and liquidity necessary to cover the loans from its investors.  In reality, KI, Inc. was a brand-new

corporate entity with little capitalization apart from Plaintiffs' investments and would never have been able to repay Plaintiffs from pre-existing capital reserves.

### 2.      Establishment Misrepresentation

68.      By and through the Brochures, the Kensington Enterprise further represented that KI, Inc. was already a profitable, established, and financially sound real estate investment firm.

69.      For example, the Brochures compared KI, Inc. to Toll Brothers, a well-established and deeply funded housing development company, stating: "Toll Brothers are a publicly traded Real Estate Firm, doing about 3000 properties per year. *We have modeled our turn key real estate system after their system. The only difference is they are in the luxury real estate market and we are in the multifamily space*."  *See* Ex. 2, at 4 (emphasis added).

70.      As another example, some Brochures suggested that Kensington had a global presence, stating that "Our mission, as an organization, is to *continue* to expand globally…" *See* Ex. 2, at 5 (emphasis).

71.      As   another   example,   an   August   6,   2018   snapshot   of "http://kensingtoninternational.co/" includes such statements as: "we are consistently making money in real estate"; "Choosing a Real Estate Niche takes time, but we already have them all down to at science"; and "[W]e've been doing this for over a decade." A copy of an August 6, 2018 snapshot of "http://kensingtoninternational.co/" is attached to this Complaint as Exhibit 7.

72.      The representations in the preceding paragraphs were materially false or misleading when made because they represented that KI, Inc. had been doing business for many years and had a track record of profitability and success.

73.      In fact, KI, Inc. was not well-established at all: corporate records show that it had only been incorporated in November 2017, the same month that it executed its first contract with Plaintiffs.  Its track record of profitability and success was nil.

12

### 3. Institutional Experience Misrepresentation

74.    By and through the Brochures, the Kensington Enterprise further represented that KI, Inc.'s owners and employees had experience in the investment and real estate industry.

75.    For example, the Brochures stated that: "Our real estate professionals have a combined 50 years experience in the real estate industry.  Our team is comprised of contractors, real estate agents, brokers, seasoned investors, and the combined experience of this group has afforded us intimate and detailed knowledge of market trends in the Greater New York area." *See* Ex. 2, at 1 ("…our team has a combined 75 years worth of real estate experience.").

76.    The representations in the preceding paragraph were materially false or misleading when made.  Neither the Individual Kensington Defendants nor any other individual in KI, Inc.'s employ had any colorable investment industry experience.

77.    The Kensington Enterprise misleadingly omitted that KI, Inc.'s team was headed by a convicted criminal fraudster.

78.    In addition, based on their communications with Defendants, Plaintiffs allege on information and belief that KI, Inc. did not have a team of contractors, real estate agents, and brokers, and that KI, Inc.'s purportedly experienced management team consisted mainly of Gelin and Edwards.

### 4. Past Success / Testimonial Misrepresentation

79.    By and through the Brochures and the Websites, the Kensington Enterprise further represented that it had a track record of success in earning meaningful returns for investors similar to Plaintiffs.

80.    For example, some of the Brochures included testimonials that now appear to have been entirely fabricated, such as this testimonial from "Kristen G.": "Hi, my name is Kristen and I am a proud client of Kensington International. I started working with them less than 8 months

ago and they invested in a property, with me, and the property already had an in buyer. *So, all I had to do was put up my credit, they raised the money, managed the contractors and as soon as the property was renovated it was sold and I made $20,000 after all fees were paid. Now, I am going through the process again! I am excited to be a part of this company.*" *See* Ex. 2, at 8 (emphasis added).

81.     Upon information and belief, "Kristen G." is either not a real person, or if she is, then the statements attributed to her are not accurate.

82.     These misrepresentations were material because they implied that KI, Inc. had a long list of satisfied investors when in fact it did not.

83.     The representations in the preceding paragraph were materially false or misleading when made.  Neither the Individual Kensington Defendants nor any other individual in KI, Inc.'s had a track record of returning investment funds with profit.

### 5.     Guarantee Misrepresentation

84.     As further inducement and assurances to Plaintiffs, the Kensington Enterprise offered personal guarantees executed by KI, Inc.'s main principals, Gelin and Edwards.

85.     In offering these personal guarantees, the Kensington Enterprise falsely assured investors that if KI, Inc. was somehow unable to repay its loans from investors, Gelin and Edwards would cover the loans with their own assets.  By doing so, Gelin and Edwards suggested to investors that they had both the financial ability and the intention to meet the legal obligations set forth in their guarantee.

86.     For example, Heaven was provided a "Guaranty Agreement" signed by Gelin which stated in part as follows:

> The Guarantor hereby absolutely and unconditionally, guarantees to
> Holders, the due and punctual payment in full of (a) the principal of,
> interest on (including, without limitation, interest accruing after the

14

filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), and any other amounts due under, the Note when and as the same shall become due and payable (whether at stated maturity or by required or optional prepayment or by acceleration or otherwise) and (b) any other sums which may become due under the terms and provisions of the JV Agreement (all such obligations described in clauses (a) and (b) above are herein called the "Guaranteed Obligations").

87.     These representations and omissions regarding Gelin and Edwards' financial ability and intention to abide by their guarantees were materially false or misleading when made.

88.     Specifically, these representations and omissions were false and misleading because they implied that the guarantees were valuable and offered a specific recourse to the Plaintiffs if KI, Inc. could not repay its loans.

89.     In reality, neither Gelin nor Edwards had the means to underwrite any significant debt at all.

### 6.     Section 8 Misrepresentation

90.     By and through the Inducement Calls, the Kensington Enterprise represented that they had relationships with "Section 8 approved" contractors who could obtain properties at favorable prices due to some sort of governmental approval, subsidization or relationship.

91.     These representations regarding KI, Inc.'s special connections with "Section 8 approved" contractors were materially false or misleading when made.

92.     During the Inducement Calls, the Kensington Enterprise represented that KI, Inc. worked with contractors that were "Section 8 housing approved."  Working with such contractors supposedly allowed KI, Inc. to obtain properties at below market prices with the expectation that the company would renovate these properties to be available back on the market.

93.     In reality, KI, Inc. had no particular capacity to obtain properties at any prices other than those found in the traditional real estate market.

### 7.     General Intent-to-Perform Misrepresentation

94.     The totality of the circumstances detailed herein permit the reasonable inference that the Kensington Enterprise persuaded Plaintiffs to furnish monies with a slew of promises that the Kensington Enterprise generally did not intend to perform on.

95.     This inference is most strongly supported by the fact that the scheme's apparent architect, Gelin, had been convicted of a similarly complex and multi-faceted financial fraud in 2009.

96.     The inference is also supported by the fact that all of the Individual and Corporate Defendants seemed to disappear in 2020, abruptly ceasing to respond to Plaintiffs' urgent inquiries.

97.     Thus, the Kensington Enterprises' various promises to perform should be considered collectively material, as well as false and misleading.

98.     There is sufficient evidence to permit the reasonable inference that at the time Plaintiffs furnished their monies for the purported investment opportunity, Defendants never intended to honor their various contractual commitments.

### C.     Plaintiffs Relied on the Kensington Enterprise's Fraudulent Misrepresentations in Deciding to Invest in KI, Inc.

99.     Plaintiffs reasonably relied on the Kensington Enterprise's seven material misrepresentations in deciding to invest and place their trust in KI, Inc. and the rest of the Kensington Enterprise.

100.     Subsequent events would clearly expose these material representations to be false.

**D.**   **Plaintiffs Enter "Joint Venture" Agreements ("JVAs") with KI, Inc.**

101.   Between November 2017 and February 2019, the five named Plaintiffs, all relying on the same or substantially similar fraudulent misrepresentations detailed above, furnished moneys to the Kensington Enterprise, as further detailed below:

(i)   **Cheryl Radix** signed a JVA with KI, Inc. on October 1, 2018 and furnished **$172,370** to the Kensington Enterprise, obtaining a Promissory Note for the same amount which matured on October 1, 2019.  To date, Kensington has repaid nothing to Ms. Radix, other than a handful of debt servicing payments made directly to lenders.

(ii)   **Julian Carrington** signed a JVA with KI, Inc. on April 10, 2018 and furnished **$175,000** to the Kensington Enterprise, obtaining a Promissory Note for the same amount which matured on April 10, 2019.  To date, Kensington has repaid nothing to Mr. Carrington, other than a handful of debt servicing payments made directly to lenders.

(iii)   **Audra Heaven** signed a JVA with KI, Inc. on October 1, 2018 and furnished **$109,700** to the Kensington Enterprise, obtaining a Promissory Note for the same amount which matured on October 1, 2019.  To date, Kensington has repaid nothing to Ms. Heaven.

(iv)   **Jigar Patel** signed a JVA with KI, Inc. on April 4, 2018, and furnished **$265,000** to the Kensington Enterprise, obtaining a Promissory Note for the same amount which matured on April 4, 2019.  To date, Kensington has repaid nothing to Mr. Patel.

(v)   **Achebe Sam** signed a JVA with KI, Inc. on February 2, 2019 and furnished **$185,000** to the Kensington Enterprise, obtaining a Promissory Note for the same

17

amount which matured on February 2, 2020.  To date, Kensington has repaid nothing to Mr. Sam.

102.    All five Plaintiffs used interstate wire communications and payment services to enter into these agreements and furnish monies to the Kensington Enterprise.

103.    Under the terms of the JVAs, Plaintiffs all agreed to (and made) loans to KI, Inc. for terms of one year.

104.    The JVAs required KI, Inc. to use Plaintiffs' capital and its own funds to acquire, renovate, and resell properties and then distribute any profits among the joint venture partners.

105.    The Kensington Enterprise drafted the JVAs and all incorporated documents, including KI, Inc.'s promissory note (Schedule 1) and Gelin and Edwards's guarantee (Schedule 2).  Plaintiffs signed the JVAs without any additions or modifications.

106.    The JVAs appeared to feature expert legal drafting, but upon closer inspection, are full of legal contradictions.

107.    For example, the title of "Joint Venture Agreement" does not match the contents of the Agreement, which merely sets forth the terms of a loan.  It does not appear to include several of the key indicia of a joint venture under New York law.  *See, e.g., Kaikov v. Kaikov,* No. 19-CV-2521 (LDH) (RER), 2020 U.S. Dist. LEXIS 186409, at *11-12 (E.D.N.Y. Oct. 5, 2020) (describing the 5 elements of a joint venture under New York law, including that "*(4) each must have some degree of joint control over the venture; and (5) there must be a provision for the sharing of both profits and losses.*") (emphasis added).

108.    In other words, the JVAs leave an unclear impression as to whether the contemplated relationship between Plaintiffs and KI, Inc. was that of investor-investee, lender-borrower, or joint venturers.

109.    Ultimately, however, in consideration of the entire course of conduct detailed herein, the JVAs should be viewed merely as an artifice of fraud; a means of inducing Plaintiffs to send money to the Kensington Enterprise.

**E.      KI, Inc. Breaches the JVAs and Fails to Make Payments Due.**

110.    Even if the JVAs were viewed as an enforceable contract—establishing either an investor-investee, lender-borrower, or joint venture relationships—Kensington clearly and egregiously breached those contracts.

111.    Most significantly, KI, Inc. uniformly failed to repay Plaintiffs on the maturity dates applicable to each Plaintiff's loan.

112.    The JVAs also required KI, Inc. to maintain capital reserves.

113.    Upon information and belief, KI, Inc. did not do this because none of the Plaintiffs received full repayment of their loans.

114.    The JVAs also required KI, Inc. to make debt service payments on Plaintiffs' loans. For some Plaintiffs, KI, Inc. did this sporadically and inconsistently for a time.  By early 2019, however, it stopped servicing all Plaintiffs' debts.

115.    In most cases, KI, Inc. failed to provide any notice to Plaintiffs that it had stopped making such payments.

116.    The JVAs also required KI, Inc. to reimburse Plaintiffs' debt origination and broker fees.  Again, KI, Inc. failed to do this for all Plaintiffs.

117.    After sending money to the Kensington Enterprise on various dates from late 2017 to early 2019, Plaintiffs initially received sporadic updates, primarily from Black or Edwards. Then they began to receive email messages from Freedcamp, KI, Inc.'s web-based project management program.  The Freedcamp messages generally did not identify the individual sender.

118.    By late 2018, however, as the first payments came due, the Kensington Enterprise began to disseminate additional misrepresentations—detailed below—to fraudulently conceal its inability and/or unwilling to perform.    Once again, the fraudulent concealment and misrepresentations were disseminated via interstate wire communications (i.e., the internet).

**F.    Kensington's Fraudulent Concealment After Plaintiffs' Investments**

119.    By early 2019, KI, Inc. had defaulted on the Maturity Dates of many of the Plaintiffs' respective loans to KI, Inc., and had also stopped making debt service payments on their loans.

120.    To induce several of the Plaintiffs to make debt service payments on their loans after KI, Inc. stopped doing so, and to generally conceal their fraudulent inducements detailed above, the Kensington Enterprise made a series of fraudulent statements, in four categories, detailed below.

**1.    Specific Property Misrepresentation/Concealment**

121.    The Kensington Enterprise repeatedly represented that it had acquired or owned property that it did not in fact own.

122.    For example, in February 2018, the Kensington Enterprise sent Carrington a Freedcamp message telling him that he is "going to be placed on" a property recently purchased in Nashville, Tennessee.  The message stated that they "are expecting to receive 100k to rehab the property this week", that the "rehab process will take approximately 8 weeks" and "after the rehab process we will place your property on the market." This message included a copy of a purported real estate purchase agreement for real property located at 1015 Pennock Avenue, Nashville, TN 37207.

123.    Carrington was also provided with numerous photographs of the Nashville property purportedly purchased on his behalf.

124.    In January 2019, the Kensington Enterprise sent Plaintiffs an identically worded but individually addressed Freedcamp message announcing the purchase of "91 acres of land in Murfreesboro, TN" and stating that the Kensington Enterprise "have utilized the monies we have received from you to lock in a portion of the land." This message also included a copy of a purported purchase agreement for the said land, identifying the Buyer as Southern Land Partners, LLC.

125.    This framed KI, Inc.'s default as a mere liquidity problem and suggested to Plaintiffs that their investments, though inaccessible, were secure in the form of specific real estate holdings.

126.    Relying on these and similar misrepresentations, Plaintiffs were reassured that their investments in KI, Inc. were secured by some particular property and would ultimately garner returns or at least full repayment.

**2.   HGTV Misrepresentation/Concealment**

127.    KI, Inc. claimed to have entered a "partnership" with a TV show in order to suggest that it was making commercial gains.

128.    In March 2019, the Kensington Enterprise sent Plaintiffs a Freedcamp message stating: "We are also happy to announce our partnership with the Television show 'Flip or Flop Nashville' on HGtv. This means that every single property that we purchase & rehab in Nashville, will end up on TV."

129.    Moreover, in a February 2018 Freedcamp message addressed to Carrington, the Kensington Enterprise represented that "[his] property will be airing on Fix or Flop Nashville in February."

130.    The Kensington Enterprise's statements in the preceding paragraph were materially false or misleading when made.

131.     On information and belief, KI, Inc. had no partnership with HGTV.

**3.     "Southern Land Partners" Misrepresentation/Concealment**

132.     In 2018 and 2019, the Kensington Enterprise claimed to various Plaintiffs that it had re-oriented to the Nashville housing market, where it expected swift and highly lucrative returns.

133.     A March 2019 Freedcamp message from Kensington Enterprise to Plaintiffs represented Southern Land Partners, LLC as KI, Inc.'s "sister company".

> Kensington International, Artist Financial Program, & our Sister company –
> Southern Land Partners, are happy to announce that we have just purchased over
> 91 Acres of land in Murfreesboro, TN

134.     While making the statements detailed above, the Kensington Enterprise concealed that: (a) Southern Land Partners ("SLP") was a Tennessee entity established in August 2018, and owned and operated by McFarland, an unqualified agent with an extensive criminal record; and (b) KI, Inc. had sent Plaintiffs' capital to MacFarland and SLP without adequate internal controls to safeguard the funds from misappropriation or theft.

**4.     Debt Service Payments Misrepresentation/Concealment**

135.     Starting in or around February 2019, KI, Inc. stopped making debt service payments on all the Plaintiffs' loans.

136.     Plaintiffs separately sent many emails and text messages to KI, Inc. urging it to make the debt service payments, as required by the JVAs.

137.     In response to Plaintiffs' many communications about debt service payments, the Kensington Enterprise followed a consistent pattern: ignore the inquiry at first, make a false excuse for the delayed payment, ask the client to resubmit the payment information, and promise payment at some later date.

138.    When the payment was not made at the promised time or less than the promised amount, and Plaintiffs inquired, the pattern started again.

139.    Below is just a sample of these communications, which continued in this vein throughout 2019:

   a.    July 2019 email from Edwards to Sam:

   You do know that it is a Holiday week, especially for the banking institutions... Correct?

   Generally we don't do anything during these weeks because we literally can not due to the fact that we work directly with the banks.

   With that said, let your banks know that we should be able to have all of the bills current with in the next 2 - 4 weeks. We have other monies coming in, outside of the refinance that we have been waiting on, and that monies is what we will use to square away everyone's debt and then we will go forward from there.

   b.    August 2019 email from Edwards to Radix:

   I literally just sent an email about you to them this morning.

   You should receive some money this week, latest Monday or Tuesday of next week. Thank you for your patience

140.    The Kensington Enterprise's statements to Plaintiffs about debt service payments were rife with excuses and obfuscation.

141.    For example, after KI, Inc., failed to service Plaintiffs' debts, at least two of the Plaintiffs, Sam and Radix, were directed to what the Kensington Enterprise described as credit repair agencies.

142.    When Plaintiffs Sam and Radix contacted this organization, however, they were asked to submit affidavits to creditors falsely stating that they had been the victims of fraud.

143.    Both Plaintiffs Sam and Radix refused to do so.

23

144.    Further, Kensington Enterprise made various statements minimizing the risk of accumulating debt and encouraging them to ignore calls from creditors. For example, in January 2020, KI, Inc. emailed Radix a newsletter, titled "WHAT REALLY HAPPENS WHEN YOU MISS A CREDIT CARD PAYMENT?", wherein it made the following representation:

> The most they can do is summon you to court and if you go before the judge and tell them that you are financially unable to pay at the moment because of a current financial hardship, the judge will summon you summon you to create a payment plan and as soon as you have money you plan to pay the debt… you will be let off of the hook.

**G.    Plaintiffs Discover That the Kensington Enterprise Is a Fraud, Operated by an Individual (Gelin) Who Had Previously Been Convicted of Felony Wire Fraud.**

145.    The Kensington Enterprise's numerous fraudulent concealments obscured the central problem: KI, Inc. lacked the funds to comply with its contractual obligations to Plaintiffs, and Gelin and Edwards never intended to honor the guarantees they had committed to in the JVAs.

146.    By the end of 2019, it became apparent to most of the Plaintiffs that KI, Inc. was not going to meet its financial obligations, and some began to suspect that KI, Inc. had been a complete scam from the outset.

147.    Finally, after years of excuses and false promises, KI, Inc. and its various agents stopped responding to Plaintiffs' inquiries altogether.

148.    This series of events raises the strong inference that the Kensington Enterprise never actually intended to repay Plaintiffs.

149.    Even if some or all of the Kensington Defendants actually intended to successfully manage a real estate investment venture, there is still clear evidence of a knowing fraud.

150.     This is readily apparent from a comparison of the various Plaintiffs' experiences with the Kensington Enterprise.

151.    This shows that the Kensington Enterprise was operating what was, at the very least, a form of Ponzi scheme.

152.    As the various Plaintiffs came to the slow, painful realization that they would never be repaid, several began to reach out to attorneys.

153.    Upon investigation by certain Plaintiffs and their counsel, it was revealed that KI, Inc.'s CEO, Gelin, had been convicted of conspiracy to commit bank fraud, wire fraud and/or mail fraud in the Southern District of New York in July of, 2009.  A copy of the Judgment against Gelin is attached to this Complaint as Exhibit 8.

154.    The grand jury indictment related to those charges accuses Gelin of having "identified and recruited straw buyers and falsified certain information provided to the lenders, in order to obtain mortgage or home equity loans." A copy of the relevant indictment against Gelin and his co-defendants is attached to this Complaint as Exhibit 9 (quoted language at para. 15).

155.    Gelin was ordered to pay more than $12 million in restitution to numerous victims (jointly and severally with certain co-defendants).

## V.    INVOLVEMENT OF EACH DEFENDANT.

156.    Although most of the Plaintiffs' interactions with the Kensington Enterprise were conducted through Edwards, Black and Gelin, a variety of other individuals were involved.  And while the Plaintiffs' funds were purportedly invested in KI, Inc., a variety of other corporate entities were used to perpetrate Defendants' fraudulent scheme.

157.    Upon information and belief, Defendant Rhina Hernandez was a legal party to several of the real estate transactions that were purportedly undertaken on behalf of KI, Inc.

158.    According to the Kensington Enterprises various emails and newsletters, Defendant Burke McFarland was also involved in organizing and managing the Kensington Enterprises foray into the Tennessee real estate market.

159.    Defendant Southern Land Partners LLC ("SLP"), a Tennessee LLC, was used to effectuate these transactions and was described as a KI, Inc.'s "partner."

160.    Defendant Kaolee Vang-Thao assisted numerous Plaintiffs in taking out personal loans, the proceeds of which would be provided to the Kensington Enterprise.

161.    Defendant Financial Saver Network, Inc. (d/b/a E-Funding Company) ("FSN"), a Minnesota Corporation, was used to effectuate these consumer loan transactions. After several of the Plaintiffs entered into agreements with KI, Inc., Vang-Thao—purportedly acting as an employee of FSN—requested their personal and financial information and using the same, acquired third party credit lines on their behalf.

162.    Certain Plaintiffs also paid FSN fees through Wire Transfer as instructed by the Kensington Enterprise. Numerous Plaintiffs also paid FSN "brokerage fees" for this.

163.    Upon information and belief, FSN lacks the various licensures required to conduct such activities.

164.    Upon information and belief, Vang-Thao is the owner of FSN.

165.    Defendant Kennsington Capital Group, LLC ("KCG"), a New York LLC, was apparently used interchangeably with KI, Inc. For example, KCG's website included information about Defendants' fraudulent scheme and certain of the promotional events Defendants hosted to induce Plaintiffs' investment were under KCG's name.

166.    Gelin, Black and Edwards all hold themselves out as officers or agents of KCG.

167.    Defendant The Business Buyers Club, LLC, ("BBC") is an active domestic limited liability company incorporated in New York State in June 2015.

168.    Upon information and belief, BBC is owned and controlled by Gelin, Black, Edwards and Hernandez.

26

169.    Gelin holds himself out as its CEO. BBC's website has previously represented that it is a "subsidiary of Kensington Capital Group, LLC."

170.    Defendant Ultimate Better World Solutions, LLC ("UBWS"), a New York LLC, was promoting the Kensington Enterprise scheme through its website.

171.    Upon information and belief, UBWS is owned and controlled by Black.

172.    Defendant Artist Solutions, LLC (d/b/a Artist Financial Programs, UNKNY) ("Artists Financial") is an active domestic limited liability company incorporated in New York State.   Defendant KI, Inc.'s and KCG's Facebook page has represented that "Kensington International has partnered up with Indie Label- UNKNY - to create the Artist Financial Program . . .  an initiative where we help recording artists and content create gain access to capital towards the advancement and development of their careers, all while giving them the tools to achieve financial stability through real estate." Upon information and belief, Artists Financial is owned and controlled by Defendants Gelin and Edwards.

## VI.    PLAINTIFFS' RESPECTIVE DAMAGES RESULTING FROM THEIR INVESTMENTS IN KENSINGTON.

173.    Defendants' various unlawful conduct caused Plaintiffs to suffer substantial financial losses.

174.    These financial losses include, but are not limited to:

   a.    Massive unpaid debts or depletion of savings to pay off massive debts for the funds that were furnished to the Kensington Enterprise.

   b.    Ballooning interest, fees, and other costs, much of which stemmed from the Kensington Enterprise's failure to inform the Plaintiffs when it stopped making payment on their debts;

    c.   Attorneys' fees for defending creditors' lawsuits, which have been initiated against many of the Plaintiffs.

175.    All the Plaintiffs also suffer from significant non-financial losses, including but not limited to:

    a.   Dramatic reductions in credit scores;

    b.   Anxiety and anguish caused by financial hardship;

    c.   Disruption and distress caused by constant collections calls from creditors;

    d.   Humiliation and frustration from being defrauded.

## VII.   CLASS ALLEGATIONS

176.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated who were fraudulently induced into lending, investing or otherwise furnishing moneys to the Kensington Enterprise. Plaintiffs seek to certify a class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

177.    The Class sought to be certified is as follows:

All individuals who invested in, lent to, or otherwise furnished money to the Kensington Enterprise based upon promises of economic gain and were either: (a) never repaid such moneys, (b) never reimbursed or fully remunerated for late fees, interest, or other costs of credit in violation of relevant contractual promises from the Kensington Enterprise, and/or (c) suffered damage to their credit score or creditworthiness.

178.    Excluded from the putative Class are (a) the named Defendants and any subsidiaries or affiliates thereof; (b) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of any of the named Defendants; (c) any entity in which any of the Defendants have a controlling interest; (d) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph; and (e) the insurance carriers or their affiliates who insure(d) the Defendants.

179.    There are predominating common questions of law and fact relating to the claims of Plaintiffs and the Class including, but not limited to, the following:

a.   Whether Defendants engaged in the fraudulent schemes or artifices described herein;

b.   Whether Defendants formed an association-in-fact enterprise (the Kensington Enterprise) for the purpose of carrying out the alleged scheme;

c.   Whether the Kensington Enterprise was an association formed to conduct or participate, directly or indirectly, in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

d.   Whether the Kensington Enterprise engaged in a pattern of racketeering activity with the intent to defraud Plaintiffs and the Class using the U.S. mails and interstate wire service in violation of 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud);

e.   Whether the Kensington Enterprise conspired to violate 18 U.S.C. § 1962(c) as prohibited by 18 U.S.C. § 1962(d);

f.   Whether Defendants fraudulently induced the member of the putative Class to enter into the JVAs and other relevant agreement;

g.   Whether KI, Inc. breached the JVAs as detailed herein;

h.   Whether KI, Inc. owed and breached a fiduciary duty to the members of the putative Class;

i.   Whether and to what extent the members of the putative Class have sustained damages as a result of the actions of Defendants complained of herein;

j.   Whether Defendants are liable for constructive trust or an accounting with respect to the putative Class;

k.  Whether Defendants may be held liable for restitution to members of the putative Class;

l.  Whether Defendants may be held liable for injunctive relief.

180.    The members of the Class sought to be represented by Plaintiffs are so numerous that joinder of all members is impracticable. Although the precise number of individuals in the putative Class is not known with certainty, Plaintiffs believe that there are dozens and perhaps hundreds of victims apart from those named on the Complaint. Members of the Class are also geographically dispersed across the United States.

181.    Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication. Individual litigation of these claims would be entirely impractical and would impair the ability of Class members to protect their interests.

182.    The claims of the named Plaintiffs are typical of those of the Class, and the named Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests do not conflict with those of the Classes, and Plaintiffs are represented by counsel experienced in complex litigation, including class actions and international litigation. Plaintiffs seek redress for the same conduct that has affected all class members and Defendants' liability on the legal claims advanced herein would be common to all members of the Class.

183.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions. Moreover, if a class is not certified, many meritorious claims will go unredressed as the individual class members are not able to prosecute

complex litigation against Defendants. Finally, it would be logistically and financially impossible for the thousands of class members to each bring an individual action.

## VIII.   ALTER EGO ALLEGATIONS

184.    The Corporate Defendants (KI, Inc., KCG, BBC, UBWS, Artists Solutions, FSN and SLP) are all privately held companies.

185.    The various Individual Defendants own one hundred percent of the Corporate Kensington Defendants.

186.    Upon information and belief, the Individual Defendants exercise complete control over the Corporate Kensington Defendants.

187.    There is a unity of interest and ownership between the Individual Defendants on the one hand, and the Corporate Kensington Defendants, on the other hand, such that the requisite degree of individuality and separateness among these Defendants, and each of them, have ceased, and that the Individual Defendants are the alter egos of the Corporate Kensington Defendants, and these entities are the alter egos of one another.

188.    The Individual Defendants have controlled and operated the Corporate Kensington Defendants as devices to avoid individual, agency, and *respondeat superior* liability.

189.    The Individual Defendants have failed to maintain the requisite degree of separateness with the Corporate Kensington Defendants and have failed to observe requisite corporate formalities.

190.    The Individual Defendants have intermingled the Corporate Kensington Defendants' assets and their personal assets.

191.    Adherence to the fiction of the separate existence of the Corporate Kensington Defendants as entities distinct from the Individual Defendants would permit an abuse of the company privilege, sanction fraud, and promote injustice.

IX.    **CAUSES OF ACTION**

**Count I**

**Violation of Federal Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961, *et. seq.***
***Against All Defendants***

192.    The Kensington Enterprise was composed of all Defendants named herein.

193.    The Kensington Enterprise's partnership and coordination with one another while purportedly acting on behalf of KI, Inc. constitutes an "association-in-fact" pursuant to 18 U.S.C. §1961(4).

194.    The Kensington Enterprise willfully and knowingly engaged in a pattern of racketeering activity involving that "enterprise" and/or their "association in fact."

195.    The Kensington Enterprise acquired and/or maintained control of KI, Inc. through a pattern of racketeering activity in violation of §1962(b).

196.    The Kensington Enterprise conducted and participated, directly and indirectly, in the conduct of the Kensington Enterprise's affairs as an enterprise and "association-in-fact" through a pattern of racketeering activity in violation of §1962(c).

197.    The Kensington Enterprise utilized the partnership among themselves and/or KI, Inc., as their personal vehicle for diverting and transferring Plaintiffs' money and investment proceeds to themselves and their individual accounts, thereby misappropriating at least $5,000,000 of investment proceeds from Plaintiffs and other members of the Class.

198.    The Kensington Enterprise shared a common purpose of obtaining pecuniary gain through: (a) fraudulent representations made as officers, representatives, and partners of KI, Inc.; (b) their design, perpetration and concealment of the fraudulent real estate investment scheme; and (c) fraudulent misrepresentations and concealments of the true nature of the various agreements

entered into with Plaintiffs, which were all part of Defendants' corrupt scheme and artifice to defraud Plaintiffs and misappropriate Plaintiffs' funds.

199.    The Kensington Enterprise's scheme was a sustained, well-developed operation organized for the purpose of defrauding Plaintiffs and other members of the Class, and misappropriating Plaintiffs and class members' funds. Each of these Defendants played a distinct and significant role in facilitating the fraudulent transfer of Plaintiffs' and class members' funds using their pattern of racketeering and their concealment of their fraud.

200.    The Kensington Enterprise knowingly, willfully and unlawfully conducted or participated, directly or indirectly, in the affairs of the Kensington Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  Each Kensington Defendant had the specific intent to engage in the substantive RICO violation alleged herein.

201.    Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(l)(B).  The Kensington Enterprise's predicate acts constituting a pattern of racketeering include, but were not limited to:

**<u>Predicate Act #1 – Wire Fraud (18 U.S.C. § 1343)</u>**

202.    The Kensington Enterprise committed acts constituting indictable offenses under 18 U.S.C. § 1343, in that it devised or intended to devise a scheme or artifice to defraud Plaintiffs and other Class members, or to obtain money or property from them by means of false or fraudulent pretenses, representations or promises. For the purpose of executing the scheme or artifice, Defendants transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice, or with knowledge that the use

of the wires communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

**Predicate Act #2 – Transporting Proceeds of Fraud (18 U.S.C. §§ 2314–15)**

203.    The Kensington Enterprise committed acts constituting indictable offenses under 18 U.S.C. §§ 2314–15, the National Stolen Property Act.  By the acts described herein, the members of the Kensington Enterprise transmitted, transferred, and received money with a value of more than $5,000, knowingly the same to have been converted and/or taken by fraud. Upon information and belief, that money was transmitted or transferred in interstate commerce. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice, or with knowledge that the above referenced transmittals, transfers or receipts would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

204.    The two foregoing predicate acts committed by the Kensington Enterprise constitute "racketeering activity" as defined by 18 U.S.C. 1961(1) et. seq., as well as a "pattern of racketeering" as defined by 18 U.S.C. 1961(5), since numerous instances of such predicate acts occurred between December 2017 and January 2019.

205.    All Defendants constitute "culpable persons" as defined in 18 U.S.C. 1961 in violating §1962(a), (b) and (c) since these defendants' coordination constitutes an "association-in-fact" for purposes of these defendants' violation of §1962(c). These defendants' actions and patterns of racketeering constitute violations of §1962(a), (b) and (c) of the Racketeer Influenced & Corrupt Organizations Act ("RICO").

**Count II**

**Conspiracy to Violate Federal Racketeer Influenced & Corrupt Organizations Act ("RICO"), 18 U.S.C. 1961, *et. seq.***

*Against All Defendants*

206.    Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

207.    The predicate acts committed by the Kensington Defendants outlined above constitutes a conspiracy to violate §1962(a), (b) and (c) of the federal RICO Act in violation of §1962(d).

208.    The Kensington Defendants' predicate act and pattern of racketeering are the direct proximate result of Plaintiffs' lost investment proceeds and capital contributions.

209.    As a result, Plaintiffs have been and will continue to be damaged.

210.    Plaintiffs are also entitled to treble damages, punitive damages and attorneys' fees as a result of these defendants' predicate acts pursuant to §1964(c).

<u>**Count III**</u>

**Fraudulent Inducement**
*Against All Defendants*

211.    Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

212.    To induce Plaintiffs to furnish monies to the Kensington Enterprise, the Kensington Defendants made several material misrepresentations and omissions.

213.    These material misrepresentations and omissions were made during the Inducement Calls, in the Brochures, and on the Websites, detailed in paragraphs 42-57 above.

214.    These material misrepresentations and omissions fall into seven categories: (i) the Capitalization Misrepresentation; (ii) the Establishment Misrepresentation, (iii) the Institutional Experience Misrepresentation; (iv) the Past Success / Testimonial Misrepresentation; (v)

Guarantee Misrepresentation; (vii) the Section 8 Misrepresentation; and (viii) the General Intent-to-Perform Misrepresentation. These are all detailed in paragraphs 58 through 98 above.

215. All seven of the aforementioned representations were materially false or misleading when made.

216. Defendants knew that these representations were false or misleading but made them with the intention of inducing Plaintiffs to invest with Kensington and enter into the JVAs.

217. Plaintiffs executed the JVAs and invested in Kensington in justifiable reliance on Kensington's misrepresentations.

218. Plaintiffs have been damaged by Kensington's misrepresentations, as they would not have executed the JVAs and invested in Kensington but for these misrepresentations.

219. Each Defendant played a direct and particular role in the crafting and presentation of these misrepresentations, as detailed herein at Section IX. To the extent details with regards to any particular Defendant's role is lacking, further investigation through discovery will be required to unearth such details, as the necessary evidence is in the Defendants' possession.

220. Defendants' actions were willful and wanton, showing a conscious and deliberate disregard of Plaintiffs' interests. The imposition of punitive damages is therefore warranted.

## Count IV

### Breach of Contract
### *Against Defendant Kensington International, Inc., Gelin and Edwards*

221. Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

222. Plaintiffs had respective contracts, styled as "Joint Venture Agreements", with Defendant KI, Inc. (the "Agreements").

223.    Plaintiffs have performed all conditions, covenants, and promises required to be performed by Plaintiffs in accordance with the terms of the Agreements.

224.    KI, Inc. materially breached the Agreements by: (1) failing to repay Plaintiffs' respective loans by their applicable Maturity Dates; (2) failing to maintain capital reserves as required in the Agreement; (3) failing to make debt service payments on Plaintiffs' loans; (4) failing to reimburse Plaintiffs' debt origination and broker fees.

225.    Gelin and Edwards also had obligations under the provisions and/or subsidiary contracts to the Agreements.  Specifically, they guaranteed certain obligations of KI, Inc.

226.    Gelin and Edwards breached the Agreements by failing to perform as required under the applicable guaranty provisions/subsidiary agreements.

227.    As a direct and proximate result of KI, Inc., Gelin and Edwards's breach of the Agreements, Plaintiffs have suffered, and continue to suffer, monetary damages in an amount to be proven at trial.

## Count V

### Breach of Fiduciary Duty
### *Against Defendant Kensington International, Inc.*

228.    Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

229.    The aforementioned Agreements between Plaintiff and KI, Inc. are titled as "Joint Venture Agreements."

230.    Once KI, Inc. entered into these joint ventures, it became a joint venture partner of Plaintiffs and was entrusted with the discretion to invest on behalf of Plaintiffs.

231.    KI, Inc. thus owed Plaintiffs the duties of care, candor, and loyalty.

232.    These duties obligated KI, Inc. to act reasonably and prudently in investing Plaintiffs' capital, disclose material information regarding the investments it made on Plaintiffs' behalf, and act in the best interests of Plaintiffs.

233.    KI, Inc. breached its fiduciary duties of care and candor by through the manifold acts of deceit, dishonesty, malfeasance, and negligence detailed herein.

234.    As a direct and proximate result of KI, Inc.'s breach of its fiduciary duty, Plaintiffs have suffered, and will continue to suffer, monetary damages in an amount to be proven at trial.

<u>**Count VI**</u>

**Fraudulent Concealment**
*Against All Defendants*

235.    Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

236.    Throughout 2018-2020, the Kensington Enterprise made numerous representations about why it was not making debt service payments on Plaintiffs' loans and the investments it made on their behalf, as detailed above Section VII.

237.    These representations fraudulently concealed material information which the Kensington Enterprise had a duty to disclose.

238.    The Kensington Enterprise knew that its representations misleadingly omitted material information to conceal their other frauds and malfeasances detailed herein.

239.    Kensington Defendants' actions were willful and wanton, showing a conscious and deliberate disregard of Plaintiffs' interests. The imposition of punitive damages is therefore warranted.

## Count VII

### Equitable Accounting
### *Against All Defendants*

240.    Plaintiffs repeat and re-allege each and every paragraph outlined above with the same force and effect as if more fully set forth at length herein.

241.    In accordance with the Agreements, which entitles Plaintiffs to full repayments of their loans, including all interest, fees, and costs incurred thereon, and their share of profits from the disposition of any properties acquired on their behalf, Plaintiffs are entitled to an accounting from Defendants.

242.    Defendants are in the best position to know how Plaintiffs' funds were used.  The books and records necessary to make such determinations are in the possession, custody, and control of Defendants. The true and correct amounts due to Plaintiffs can only be ascertained by an accounting performed under the supervision of the Court.

## X.    PRAYER FOR RELIEF

243.    Plaintiffs pray for relief and judgment as follows:

   a.    compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

   b.    prejudgment interest;

   c.    statutory and/or punitive damages;

   d.    equitable accounting and injunctive relief;

   e.    reasonable costs and expenses incurred in this action, including attorneys' fees and costs; and

   f.    such other relief as the Court deems just and proper.

## XI.    JURY DEMAND

244.    Plaintiffs hereby demand a trial by jury.


Dated:      New York, NY                    Respectfully submitted,
            October 31, 2022

                                            **THE LINDEN LAW GROUP, P.C.**

                                            By:*/s/ Jeffrey Benjamin*
                                            Jeffrey Benjamin, Esq.
                                            5 Penn Plaza, 23rd Floor
                                            New York, NY  10001
                                            (212) 835-1532
                                            jbenjamin@nyfraudlaw.com

                                            **THOMPSON & SKRABANEK, PLLC**

                                            By: */s/ John J. Thompson*
                                            John J. Thompson
                                            42 W. 38th Street, Room 1002
                                            New York, NY 10016
                                            (646) 568-4280
                                            jt@ts-firm.com

                                            *Counsel for Plaintiffs and the Putative Class*